

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

DEC 2 9 2025

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN DISTRICT OF GEORGIA**

CORETTA FRASER            :
TONA BRANCH               :
GLENDA CODY               :
CATRICE GILMORE           :     CASE NO. 1:25-CV-7414
LASHAUN WHITE             :
KIMBALL THORNTON          :
MARQUITA ROSS,            :
                          :
Plaintiffs,               :
                          :
v.                        :
                          :
GEORGIA DEPARTMENT OF HUMAN :
SERVICES (DHS) – DEPARTMENT OF :
FAMILY AND CHILDREN SERVICES, :
                          :
Defendant.                :     :

---

## COMPLAINT

Coretta Fraser, Tona Branch, Glenda Cody, Catrice Gilmore, Lashaun White, Kimball Thornton and Marquita Ross ("Plaintiffs"), bring this action against Defendant Georgia Department of Human Services (DHS) – Department of Children and Family Services for race discrimination, retaliation, harassment, intentional infliction of emotional distress and hostile work environment.

## PARTIES

### 1.

Plaintiffs are citizens of the United States and live in the state of Georgia, where they have resided at all times relevant to this suit.    Plaintiffs submit themselves to the jurisdiction of this Court.

### 2.

Georgia Department of Human Services (DHS) – Department of Children and Family Services, may be served by designation of Personal Service of Process at 47 Trinity Avenue SW, Atlanta GA 30334 to either Regina M. Quick, Pamela Carr Crosby or Dana Carroll by Order of Candice L. Broce.

### 3.

Defendant is subject to the jurisdiction of this Court.

### 4.

Service of process is timely, valid, and appropriate in all respects.

## JURISDICTION AND VENUE

### 5.

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

### 6.

The Plaintiffs assert race discrimination, harassment, hostile work

environment and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 et seq. ("§ 1981").

7.

Pursuant to 28 U.S.C. § 1391(b) and N.D. GA. L.R. 3.1, the Atlanta Division of this Court is the proper venue for claims because Defendant is subject to this Court's personal jurisdiction, 28 U.S.C. § 1391(c)(2), and a substantial part of the events or omissions giving rise to the claim occurred within the Atlanta Division of this Court. *See also* N.D. Ga. L.R. 3.1(B)(1)(a) and 3.1(B)(3).

8.

Georgia Department of Human Services (DHS) – Department of Family and Children Services is a covered employer under Title VII and 42 U.S.C. § 1981.

9.

Marquita Ross received a Right to Sue Letter dated 09/30/2025. Catrice Gilmore received a Right to Sue Letter dated 09/30/2025. Tona Branch received a Right to Sue Letter dated 11/17/2025. La Shaun White received a Right to Sue Letter dated 11/18/2025. Kimball Thornton received a Right to Sue Letter dated 11/18/2025. Glenda Cody received a Right to Sue Letter dated 11/20/2025. Coretta Fraser received a Right to Sue Letter dated 11/20/2025.

## FACTS

### 10.

The Plaintiffs in this case were assigned to the SNAP E&T HUB ("the HUB") of the Division of Family and Children Services. The Plaintiffs in this case are all Black or African American.

### 11.

HUB employees were Melodie Hayes, Tona Branch, Catrice Gilmore, Glenda Cody, Kimball Thornton, La Shaun White, Marquita Ross, Coretta Fraser, Loyd Pack (white), and Kristi Register (white). Felicia Ellis served as Director, which is several levels above the Plaintiffs in this case. HUB Plaintiffs were unclassified employees.

### 12.

The Black HUB Staff were Tona Branch, Catrice Gilmore, Glenda Cody, Kimball Thornton, LaShaun White, Coretta Fraser and Marquita Ross. Melodie Hayes (Black) was supervisor of all HUB Staff.

### 13.

Loyd Pack was the only White male assigned to the HUB Staff.

### 14.

During 2024, Melodie Hayes ("Ms. Hayes") was supervisor to all of the above-named HUB employees either directly or indirectly. Melodie Hayes was

also supervisor to Loyd Pack (white male).

15.

Ms. Hayes was responsible for supervising and writing performance evaluations for Loyd Pack and other designated HUB staff.

16.

During 2024, Melodie Hayes directly supervised Loyd Pack, Catrice Gilmore, Coretta Fraser and Tona Branch.

17.

During 2024, Loyd Pack directly supervised LaShaun White, Glenda Cody, Kimball Thornton and Marquita Ross. Each of these supervised employees are Black.

18.

The Plaintiffs (HUB Staff), Felicia Ellis (Director) and other team members attended a Convening in Savannah, Georgia on or about February 2024. The Convening was off-site. Felicia Ellis was the ranking official from DFCS. Others present were non HUB staff employees, but primarily white. These primarily white employees were also subordinate to Felicia Ellis.

19.

During a discussion at the Convening about work and workplace problems, concerns, wants and needs, Felicia Ellis (Director) insulted and threatened the

Black employees with a **racial slur** saying, "this is not the NAACP." Felicia Ellis'
words constituted a direct threat, particularly addressed to the Black employees as
seen by the NAACP comment. She threatened Black employees with negative
consequences if they ever went over her head to Human Resources with any
Complaint. Based on the racial slur, it was clear to the Black employees that the
threat was directed to them because of their race (excluding white employees.

20.

That standing Order ("do not file a complaint") was alive, well and effective
for the months of March, April, May, June and July of 2024 when the Plaintiffs
were terminated. The standing Order was memorialized and emphasized again in a
letter sent to employees in May 2024, by which these Black employees were
suspended indefinitely without pay and without explanation given for the
suspension. The letter reinforced the atmosphere of fear and intimidation among
the Black employees.

21.

After returning back to work after the Convening, Felicia Ellis attacked the
Black employees by setting new unfamiliar expectations, implementing new
procedures and increasing the work load for the Black employees. This was meant
to frustrate and confuse the Black employees and overload them with work in order
to help to manufacture a cause for disciplinary action.

22.

As the Plaintiffs attempted to adjust, Felicia Ellis doubled down in March April and May of 2024. Ms. Ellis escalated her campaign to implement changes to work plans, goals and methods on a continually fluctuating basis and at an accelerated frequency. Ms. Ellis' actions put a tremendous amount of fear and emotional pressure on the African Americans. The accompanying strategy employed by Felcia Ellis was the astronomical increase in work load which was sure to push the Black employees to the breaking point.

23.

The resurrection of cases which had become inactive years prior was Ms. Ellis' key strategy. Instead of HUB staff having a goal of 8-10 cases per day, the astronomical increase in work load demanded 48-50 cases per day. That was almost a six-fold increase.

24.

Under standard operating procedures, workload and cases were assigned to the HUB staff every morning by computer program. The computer program used a round-robin method e.g. "one for you" then "one for you" and continuing in that pattern until the entire case load was assigned. The goal of round robin assignment was originally directed to giving each employee an equal number of cases. There was no sorting or analysis as to degree of difficulty of any particular cases.

25.

Under the increase, the Black employees continued to receive up to 48-50 cases per day for the months preceding the indefinite suspension without pay all the way up to May 2024. The only white employees on the HUB team were Kristi Register (white female) and Loyd Pack (white male). Neither of them saw a case load increase at all. One of the reasons is that the designated case load for Kristi Register (white) was redistributed to the Black employees by order of Felicia Ellis and Loyd Pack. It was directed to keeping the white employees in the comfort zone. Ms. Ellis knew or had reason to know that her actions were discrimination. Accomplishing the daily business by Black employees was rendered practically impossible in light of the revival or mountain of dead cases by Felicia Ellis.

26.

Seeing the extreme disparity, Black employees questioned Supervisor Loyd Pack as to why computer generated cases labeled and designated for Kristi Register were redistributed by hand to the Black employees. Loyd Pack (white male) gave no acceptable explanation except that it is what Felicia Ellis told him to do.

27.

The Black Employees complained to their supervisors about the ever changing expectations, and ever changing work procedures. However, they were in

fear of Felicia Ellis because of the racial threats of negative consequences if the Black employees complained over her head. Therefore, they were forced to suffer in silence.

28.

Felicia Ellis' standing orders prohibiting the Black employees from making discrimination or related complaints to Human Resources was still in full effect up to their termination without explanation in July 2024. Felicia Ellis knew that she had the Black employees afraid to speak out for fear of greater punishment including termination as she had vowed.

29.

During 2024, the employees who worked under Loyd Pack always followed Loyd Pack's procedural guidelines for all time management and reporting issues, including clocking in for work, clocking out for work, taking lunch breaks, vacation or other leave and various types of absences from work. Loyd Pack approved, pre-approved and signed off where signature was required. Felicia Ellis knew or should have known of this. Even though Felicia Ellis knew this, she relentlessly pursued her efforts to spare Loyd Pack and punish the Black employees for her manufactured time discrepancies.

30.

Any variations in work hours or changes or interruptions in work

schedules were pre-approved by Loyd Pack. Loyd Pack approved work schedules for about 62% of HUB staff, said HUB Staff reporting directly to Loyd Pack. Felicia Ellis knew or should have known of this prior to accusing the staff for time entries dictated and finalized by Loyd Pack.

31.

During 2024, all of the HUB staff worked only from home ("telework"). There was no physical reporting to work for any of them.

32.

The Defendant, including Felicia Ellis, knew or should have known that there were written or management directed procedures in place for managing variations, changes or interruptions in employee work schedules.

33.

One of the procedures for HUB STAFF reporting to work was for the worker to make a real time telephone call to their supervisor (Loyd Pack) also, and give verbal notice via telephone call that the employee has arrived for work. Loyd Pack noted the time of that call by the Black employees daily. Felicia Ellis knew or should have known this, but let Pack go completely free, despite his 100% liability for any time issues or discrepancy, either real or perceived.

34.

Additionally, at least 62% or more of workers in the HUB STAFF sent an

email message each morning to Loyd Pack to inform him that they had begun work. Felicia Ellis knew or should have known of this.

35.

Any variation in daily work schedules, including early or late reporting was pre-approved by Loyd Pack for about 62% or more of the HUB Staff. Felicia Ellis knew or should have known of this.

36.

In addition, about 62% or more of HUB Staff employee submitted an Excel spreadsheet of their work hours to Loyd Pack to edit (after his own pleasure) before he released the Staff to send their time to Payroll. If there were discrepancies or violations, then Loyd Pack alone was culpable. Felicia Ellis knew or should have known of this.

37.

Loyd Pack amended about 63% of total Staff's time reporting entries as he saw fit and returned them to the staff for transmission to Payroll with changes. Plaintiffs were not responsible for the changes. Loyd Pack was 100% responsible, but the Black employees were punished for his deeds. Felicia Ellis knew or should have known of this.

38.

Staff submitted time to Payroll incorporating the changes which Loyd

Pack mandated.  As such, if there were discrepancies or violations, then Loyd

Pack alone was culpable.  Felicia Ellis knew or should have known of this.  Yet

she pursued the Black employees instead of Loyd Pack

39.

Each day, HUB Staff also documented their work in an Official State

generated Daily Telework Log.  The Telework Log was emailed to Loyd Pack

or Melodie Hayes on a daily basis for review and approval.  Felicia Ellis knew

or should have known of this. Yet she pursued the Black employees instead of

Loyd Pack.

40.

For anything and everything Loyd Pack or Melodie Hayes flagged in the

Telework Log which required clarification or additional editing, the Log was

returned to the Staff to address any questions raised.  To complete this process,

Staff submitted a new Telework Log based on instructions of Loyd Pack and

Melodie Hayes. If there were discrepancies or violations, then Loyd Pack and

Melodies alone were culpable.  Felicia Ellis knew or should have known of this.

Yet she pursued the innocent Black employees instead of Loyd Pack.

41.

HUB Staff were additionally required to submit daily work plans to Loyd

Pack and Melodie Hayes every morning. If there were any disagreement with

work plans, then they were amended on the spot by Loyd Pack and Melodie Hayes. Felicia Ellis knew or should have known of this. Yet she deliberately sought to hurt the Black employees.

42.

.   HUB Staff's typical work day activities began by first checking for emails and then responding to emails, retrieving voice messages and responding to voice messages, logging into the Gateway Portal to address matters requiring attention, and to make entries as required. Felicia Ellis knew or should have known of this.

43.

HUB Staff never had any means to enter any work hours in Gateway, never entered any data concerning time reported to work in Gateway and never entered time on lunch break, time leaving work in Gateway. HUB Staff have never seen any means of entering work time into Gateway. There was no way for Gateway to capture work time information. Felicia Ellis knew or should have known of this. Yet she relentlessly pursued the Black employees to pin some blame on them for something they had no involvement with.

44.

Portions of HUB Staff's daily work was performed using the STEP PORTAL and GATEWAY. They were never required to do any certain amount

of work in any portal.  Felicia Ellis knew or should have known of this. Yet she fabricated some non-existent work requirement in order to punish the Black employees.

45.

Portions of HUB Staff's daily work required using SHAREPOINT. Felicia Ellis knew or should have known of this.  Yet she focused on one particular portal in order to falsely accuse the Black employees as to spending an unknown amount of time on one portal or the other.

46.

Staff were never tasked with any requirements to spend a certain amount of time in any Portal, including GATEWAY or time spent in performing any particular tasks.  Felicia Ellis knew or should have known of this. Yet she fabricated a fictitious scenario by which she could punish the Black employees.

47.

If there were issues with work reported by HUB Staff in the Telework Log, the issues were addressed by Loyd Pack or Mélodie Hayes prior to their validating the sufficiency of the entries made.  Felicia Ellis knew or should have known of this.

48.

Among HUB employees, the only white male in the HUB, Loyd Pack,

had been elevated to a status as Quasi Supervisor to part of the team, including
Tona Branch, Glenda Cody, Kimball Thornton, La Shaun White and Marquita
Ross.

49.

In this role, Loyd Pack was still assigned to and reporting to Ms. Hayes.
Ms. Hayes retained direct and indirect supervisory responsibilities for the work of
all members of the HUB, including Loyd Pack.

50.

Ms. Hayes often assigned a substantial amount of work tasks to Loyd
Pack as needed on a regular basis, a substantial portion of which work tasks
were the same work tasks which she assigned to other subordinate HUB staff.

51.

Many of the tasks which Ms. Hayes assigned to either Loyd Pack and/or
the HUB staff were the tasks of screening monthly participant reports,
uploading participant reports to Sharepoint, keying monthly participation hours,
providing ineligible on the MPR Report to Community Engagement, updating
the weekly IEP Report, Updating the Outlook Calendar, Updating the
Disenrollment Report, submitting Telework Logs, submitting leave requests,
reviewing Telework Logs.

52.

The daily sign-in/reporting for work time was accomplished by Staff making a telephone call to either Ms. Hayes or Loyd Pack. The caller either said something to the effect that "I'm in" or "I'm here". The Staff followed up the telephone call via an email to either Ms. Hayes or Loyd Pack. This was real-time reporting. Felicia Ellis knew or should have known of this.

53.

Any absence from work for vacation, sick or any other matter was cleared with either Loyd Pack or Ms. Hayes ahead of time. Pre-approval of later arrivals or late departures were cleared through either Ms. Hayes or Loyd Pack ahead of time. This system, instituted DFCS, worked well for the HUB staff. There were no issues with the staff for time management during all time periods relative to this Complaint. Felicia Ellis knew or should have known of this. Yet Felicia Ellis decided to find fault with the Black Employees instead of verifying approval of time entries with Loyd Pack of Ms. Hayes.

54.

Some of the HUB's tasks required interacting with several portals, said portals being Gateway, Sharepoint and the Step Portal. Some of the HUB's tasks required communications with external customers by telephone (call and/or text), email or via one or more of the portals. Felicia Ellis knew or should have known

of this. Despite her knowledge, she attacked the Black employees directly.

55.

On a typical work day, the first action by the HUB staff after they clocked-in was to read incoming communications, the communications usually comprised of incoming emails, voicemail and text messages. The Staff spent the earlier part of the morning responding to the incoming communications. Felicia Ellis knew or should have known of this. Despite her knowledge that there was no wrongdoing by the Black employees, she pursued them anyway.

56.

On a typical work day, HUB staff would log into the Gateway Portal to retrieve and manage incoming tasks. This is usually during the first hour or two after clocking in to work. Felicia Ellis knew or should have known of this.

57.

Gateway never functioned as a time reporting vehicle with respect to clocking in and clocking out. Gateway only captured periods when Gateway was active or inactive. This could be exaggerated because Gateway shuts down based on its own internal algorithms even though the user has moved on to other non-gateway tasks. Felicia Ellis knew or should have known of this.

58.

On or about May 12, 2024 thru May 16, 2024, each of the HUB Staff

received a letter suspending them indefinitely without pay.  The letter was void of any details of the reason for suspension. Loyd Pack did not receive a letter.

59.

Melodie Hayes was not consulted or put on notice of any pending suspension of members of her team prior to the mailing of the letter.

60.

Loyd Pack (white male) did not receive a letter suspending him indefinitely without pay.  Loyd Pack continued his employment.

61.

The letter provided that the indefinite suspension was "due to findings from an internal audit conducted on your unit." The letter provided no other substantive reasons for the suspension.

62.

The letter stated, "you are instructed and directed not to discuss this suspension without pay with other Division of Family & Children Services employees, former or current clients, except Tangela Hayes, HR Generalist Supervisor or Carla Fairley, Sr. Director of State Operations." Felicia Ellis did not include a name for reporting discrimination on her call-only list.  This was to intimidate Plaintiffs from filing an internal discrimination or related complaint.

63.

The letter further provided "Your failure or refusal in any way to follow these directives precisely may result in further disciplinary action being taking against you, up to and including your separation from employment." This was a deliberate act directed to hurting the Plaintiffs even deeper. Felicia Ellis wanted to compound the suffering of the Black employees.

64.

On or about July 2, 2024 through July 6, 2024 DFCS sent a termination letter to all HUB Staff who had been working under Melodie Hayes, except for Loyd Pack, but excluding one HUB staff member who quit while under the indefinite suspension without pay.

65.

The letter cited, *inter alia,* violations of Department of Human Services, Human Resources Policy #1201-Conduct Standards and Ethics in Government, Section F, Department of Human Services, Human Resources Policy #1201-Conduct Standards and Ethics in Government, Section G, Activities and Conduct During Work Hours, #5, Department of Human Services, Human Resources Policy # 111- Telework, Section E: Application Process & Employee Responsibilities, # 13. Felicia Ellis knew or should have known that these accusations were false.

66.

The Black employees in the HUB Unit never violated any of the policies named in the termination letter.  Felicia Ellis knew or should have known of this. Yet, despite her knowledge, she chose to discriminate against the Plaintiffs.

67.

Without consulting with the supervisor, Melodie Hayes, Felicia Ellis compiled a list of alleged employee infractions to HR management, claiming that the HUB employees had been violating company policies.  Felicia Ellis knew that there were no actual infractions and no validity to the violations as she alleged.

68.

Felicia Ellis did not consult Melodie Hayes, or Loyd Pack to inquire or confirm the lack of veracity of the allegations prior to escalating to HR.  Felicia Ellis knew that her accusations were false, and merely a pretext for discrimination.

69.

In her email to HR, Felicia Ellis alleged that "Due to staff performance, an audit was conducted on all SNAP E&T Hub staff."  Felicia Ellis knew or should have known that her allegation concerning staff performance was false.

70.

In her email to HR, Felicia Ellis wrote "the audit revealed that staff is not calling customers and over 90% of the job requires phone contact and the use of

one or both computer systems." This was a false allegation, and Felicia Ellis knew or should have known that.

71.

In her email to HR, Felicia Ellis wrote "As part of the audit, phone logs, Gateway Action History, telework logs, and timesheets were reviewed." Felicia Ellis knew or should have known that telework logs and time sheets had undergone several levels of real-time review and approval by immediate supervisors, including Loyd Pack and Melodie Hayes.

72.

In her email to HR, Felicia Ellis wrote "Some staff do not log into the system until 30 minutes after the scheduled start time." Felecia Ellis knew or should have known that Gateway does not have a scheduled start time. Felecia Ellis knew that the start times for work were submitted each morning through multiple means such as real time emails and phone calls to their supervisors

73.

In her email to HR, Felicia Ellis wrote "They also have extended periods of absence out of the computer systems." Felecia Ellis knew or should have known that here assumptions were false and that a mere crunching of data revealed that HUBB Staff work was accomplished both in and out of computer systems, and some staff used Gateway over 90% of the work day.

74.

In her email to HR, Felicia Ellis wrote "Some staff are working pass the time which is reflected on their time sheets." There is no doubt that Felicia Ellis knew or should have known that Loyd Pack made final changes to time sheets and also approved the time sheet on a daily basis for at least 62% or more of HUB Staff.

75.

In her email to HR, Felicia Ellis wrote "Carla and I met with staff to try to seek a clear understanding of the daily work and to provide support of their work by seeking clarification and/or justification for the time that staff were not in the system." Felicia knew or should have known that the daily Telework Logs and Calendars documented daily work and activities and there was no need for inquiry beyond the documentation. Ms. Ellis had in her position all of the work activity related logs in her possession at a time that she asked the Plaintiffs to sort days of work activity by memory. It was a pretext for discrimination.

76.

In her email to HR, Felicia Ellis wrote "We also had each staff to submit a justification." However, Felicia Ellis had all work related documentation in her possession, and there was no valid reason to subject the employees to further inquiry.

77.

In her email to HR, Felicia Ellis wrote "In reviewing their justifications, no one provided a justifiable reason on the <u>extended periods of time away from Gateway</u>. We are seeking HR guidance with this matter." However, Felicia Ellis knew or should have known that employees had no information or documentations showing how much time they spend in or out of Gateway. Felicia Ellis knew that documentation of all work activities had been captured daily through multiple methods and media external to Gateway. It was a pretext for discrimination.

78.

A considerable part of the email discussion with HR management was devoted to promoting and developing Loyd Pack (white male). Felicia Ellis and HR personnel knew or should have known that it was Loyd Pack who endorsed and ordered submission of all time sheets and documents related daily work.

79.

After the Plaintiffs received the notice of suspension without pay on or about May 12, 2024 through May 16, 2024, Plaintiffs tried to contact Human Resources in efforts to file a group discrimination complaint. Human Resources did not answer phone calls and voice mails and would not provide information for filing a discrimination Complaint. Human Resources continued to refuse to answer numerous phone calls from Staff.

80.

Plaintiffs knew that making calls to Human Resources could be used by the Defendant to increase the suspension without pay time. Ultimately the Defendant retaliated by extending the suspension from a statutory limit of 30 days to 50 days. This was related to the Plaintiffs having been threatened to not go to HR or to anyone over her head. Felicia Ellis knew or should have known that suspensions beyond 30 days were not permitted by law and policy.

81.

Plaintiffs were terminated by letter on or about July 2 2024 – July 6, 2024 without giving the Plaintiffs a reason for the termination. The harsh treatment also was in part retaliation for complaining to HR against the threats and orders from Felicia Ellis. All of these were in violation of the terms and conditions of employment. Loyd Pack was not terminated.

## ADMINISTRATIVE PROCEEDINGS

82.

All of the Plaintiffs timely filed discrimination Complaints with the Georgia Commission on Equal Opportunity, and obtained review by the Equal Employment Opportunity Commission ("EEOC"). Thereafter, beginning on September 30, 2025, the EEOC has issued right to sue letters for all Plaintiffs. All

administrative prerequisites for filing suit on all claims have been satisfied.

83.

This suit is timely, appropriate, and valid in all respects.

## PUNITIVE DAMAGES ALLEGATIONS

84.

Plaintiffs re-allege and incorporate by reference paragraphs 1-83. Defendant undertook all actions in this Complaint intentionally, willfully, and maliciously with respect to Plaintiffs' and their federally protected rights.

85.

Additionally, Defendants undertook all actions in this Complaint with reckless disregard for and their federally protected rights.

## COUNT ONE

### § 1981 Race Discrimination: Disparate Treatment

86.

Plaintiffs incorporate the foregoing Paragraphs 1-85 as if fully set forth and restated herein.

Plaintiffs, who are members of a racial minority, had their workloads increased from 8-10 cases per day to 48-50 cases per day, while the lone white female employee's initial assignments of 48-50 cases per day were withdrawn daily and redistributed to the Black employees, to keep the white employees cases

at 8-10 cases per day.

87.

Defendant intended to and did discriminate against the Black employees on the basis of race.

88.

Defendant interfered    with the Plaintiffs' employment    and took adverse employment actions against them that caused financial, medical and other harm.

89.

Race was a but-for cause of the adverse employment actions taken against them. In other words, they would not have been suspended indefinitely without pay and terminated, and therefore, would not have suffered the loss of legally protected rights, if they were not Black and African American.

90.

In addition to other facts that will be further explored in discovery, evidence that the adverse actions the Black employees were the result of intentional race discrimination includes:

(a)    Defendant's threat of retaliation if Plaintiffs complained of their treatment to anyone above her head;

(b)    Defendant's continual changing of instructions and procedures to keep

the Plaintiffs frustrated, off balance and confused;

(c)    Defendant's retaining Loyd Pack (white male) and suspending Black Employees indefinitely without pay.  Further, Loyd Pack remained in the employ of the Defendant while his Black co-workers were terminated.

(d)    Defendant's discharging the Black Employees while retaining Loyd Pack;

(e)    Defendant's attributing time reporting concerns to  Plaintiffs rather than to Loyd Pack while having knowledge that Loyd Pack approved and directed and approved all submissions for time management and time reporting on a daily basis. There were no exceptions.

(f)    Defendant's continued employment of Loyd Pack in the face of Defendant's knowledge that Loyd Pack edited and approved of all time reporting on a daily basis before it could be sent to payroll. Loyd Pack was targeted for a management development program instead of punishment.  Loyd Pack bore all of blame for any non-conforming time transaction.

91.

Defendant's discriminatory adverse employment actions against Plaintiffs interfered with their ability to enjoy the benefits, privileges, terms, and conditions of their employment relationship.

92.

Plaintiffs are entitled to damages due to Defendant's violation of 42 U.S.C. § 1981.

## COUNT TWO

### § 1981 Retaliation

93.

Plaintiffs incorporate the foregoing Paragraphs 1-92 as if fully set forth and restated herein.

Plaintiffs engaged in statutorily protected activity by attempting to complain of race discrimination on or around May 2024 and June 2024.

95.

After Plaintiffs suspended, they were under threat of discussing the matter with anyone except designated individuals. Group members called all available phone numbers and left voice mails, and believe these "violations" prompted the decision to further extend the indefinite suspension without pay and ultimately terminate their employment. This action was due to their race and engagement in statutorily protected activity.

96.

Plaintiffs' race and related engagement in statutorily protected activity was a but-for cause of the extension of the suspension without pay and to terminate the

Plaintiffs. In other words, they would not have suffered adverse employment actions, and, therefore, would not have suffered the loss of a legally protected rights, if they were not African American and had not engaged in the protected activity.

97.

Defendant's illegal adverse employment actions against Plaintiffs interfered with their ability to enjoy the benefits, privileges, terms, and conditions of their employment relationship.

98.

Plaintiffs are entitled to damages due to Defendant's violation of 42 U.S.C. § 1981.

## COUNT THREE

### § 1981 Hostile Work Environment

99.

Plaintiffs incorporate the foregoing Paragraphs 1-98 as if fully set forth and restated herein.

As African Americans, Plaintiffs belong to a protected group.

100.

Plaintiffs were subjected to unwelcome harassment due their race.

101.

The harassment suffered by Plaintiffs was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. Examples of the harassment include:

(a)     Felicia Ellis' and Loyd Pack's distribution of the work load to all of the Black HUB staff, but not to HUB Staff member Kristi Register (White female).

(b)     Recommending promotion for white employee Loyd Pack while recommending punishment for the Black employees.

(c)     Retention of Loyd Pack and suspension and firing for the Plaintiffs;

102.

Defendant is liable for the hostile work environment under either a theory of vicarious or of direct liability.

103.

The hostile work environment created by the Defendant interfered with the Black employees' ability to enjoy the benefits, privileges, terms, and conditions of his employment relationship.

104.

Plaintiffs are entitled to damages due to Defendant's violation of 42 U.S.C. § 1981.

## COUNT FOUR

Intentional Infliction of Emotional Distress

105.

Plaintiffs incorporate the foregoing Paragraphs 1-104 as if fully set forth and restated herein.

Defendants were aware that Plaintiffs had not violated any workplace rules, but falsely accused them and inflicted as much pain as Defendant could.

106.

The Plaintiffs were given no reasons for their indefinite suspension without pay.

107.

The harassment suffered by the Plaintiffs was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

108.

Defendant deliberately kept Plaintiffs clueless and extended the indefinite suspension without pay beyond the statutory 30 day limit, and terminated Plaintiffs at almost 50 days of suspension without pay.

109.

The situation created by Defendant interfered with ability to enjoy the benefits, privileges, terms, and conditions of his contractual employment

relationship.

110.

Plaintiffs are  entitled to damages due to Intentional Infliction of Emotional

Distress and Defendant's violation of Title VII.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand a TRIAL BY JURY and the following

relief:

(a)    Declaratory judgment that Defendant's actions violated § 1981 and

Title VII rights;

(b)    Full back pay from the date of the adverse employment action taking

into account all raises to which  would have been entitled but for Defendant's

unlawful activity, and all fringe and pension benefits of employment, with

prejudgment interest thereon;

(c)    Reinstatement or front pay to compensate Plaintiffs for lost future

wages, benefits, and pension;

(d)    Compensatory damages in an amount to be determined by the

enlightened conscience of the jury for Plaintiffs' emotional distress, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and special damages;

(e)    Award of costs and expenses of this action, together with reasonable

attorney and expert fees;

(f)     Punitive damages in an amount to be determined by the enlightened conscience of the jury sufficient to punish Defendant for its conduct toward Plaintiffs and deter Defendant from similar conduct in the future;

(g)     Judgment against Defendant for damages incurred by Plaintiffs ;

(h)     Judgment against Defendant in an amount to fully and adequately compensate Plaintiffs;

(i)     A trial by jury on all issues triable by a jury; and

(j)     Other and further relief as the Court deems just and proper.

Respectfully submitted this 28th day of December 2025.

BY:   /s/ Percy L Square
          Georgia Bar No. 812436
          Attorney for Plaintiffs
          2379 Apalachee Crucis Ln
          Dacula, GA 30019
          T:  (678) 227-8511
          E:  *plsquare@yahoo.com*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing COMPLAINT has been prepared with 14-point Times New Roman font, which is one of the font and point selections approved by this Court in Local Rule 5.1(C).

This 28th day of December, 2025.

BY:  /s/ Percy L Square
Georgia Bar No. 812436
Attorney for Plaintiffs
2379 Apalachee Crucis Ln
Dacula, GA 30019
T: (678) 227-8511
E: *plsquare@yahoo.com*